## ELTING v. TOWN OF EAST CHESTER

*(District Court, S. D. New York. April 1, 1892.)*

WHARFAGE—NAVIGABLE STREAM—DUTY OF WHARFINGER—RIVER BED.

The owner of a wharf in a public navigable stream about 150 feet wide, who keeps the usual berths safe for which wharfage is charged, is not required to dredge or to keep even the bed of the stream near its middle, abreast of the wharf, so that vessels against which no wharfage is chargeable may moor, and lie there safely until they can come to the wharf in turn; and where a boat moored at high water nearly in the middle of the stream, outside of three other boats at such wharf, without directions from the wharfinger, paying no wharfage, and not being liable to pay any, and the person in charge of her ascertained soon after her arrival, and before the tide fell, that the bottom was uneven, and knew that he would be aground at low water, and the boat did take the ground and received injury, *held*, that the vessel took the risk of injury arising from the uneven nature of the bottom, and could not recover for her damage.

In Admiralty. Libel for damage to canal-boat while lying off respondents' wharf.

*Hyland & Zabriskie*, for libelant.

*Milo J. White*, for town of East Chester.

*Wing, Shoudy & Putnam* and *Mr. Burlingham*, for C. Schmidt.

BROWN, District Judge. The libelant's canal-boat, loaded with coal, was damaged by grounding upon an uneven bottom abreast of the dock in East Chester creek. This dock was built on public lands, the title of which was in the trustees of public lands, but subject to the directions, however, and for the benefit, of the town. The dock accommodated but a single boat at a time; and the usage was to charge wharfage only by the day against the boat which was actually using the wharf for discharging or loading cargo. The libelant's boat arrived about noon of May 5, 1891. Three boats were moored along-side of the wharf. The libelant's boat took position as the fourth boat outside, occupying a position from about 65 to 83 feet away from the dock. She paid no wharfage, and was not liable to pay any, until she should come along-side the dock in turn to unload. The whole width of the stream at high water was about 150 feet; and the middle was the dividing line between East Chester and the town of Pelham. At low water the bottom of the creek was bare, except a space of about 10 feet in breadth near the middle. The libelant's boat occupied at low tide a part of this water, and so much of it that a small row-boat could only be pushed past her with difficulty; there was no room to row.

On arrival the master of the boat was told by some men on the other boats, or on the wharf, but not by any person representing the defend-

ants, that as good a place to moor as anywhere was outside of the three boats. Being in haste to return, he left the boat there, directed his son to examine the ground, and immediately returned to New York with the tug that brought the boat. The son examined with a pole and found the ground uneven with holes, but made no change of position a that time. After the next low water the boat was found somewhat sprung and leaking. Two subsequent changes of place were made, but without getting a good position. The above libel is filed for the damages sustained in the springing of the boat through the unevenness of the bottom of the creek.

I do not think either of the defendants liable for this damage. Neither of them directed the boat to come up at the time she came, or to take up the position which she assumed. Her position was very near the center of the stream. That position was not one appurtenant to the dock, nor was wharfage charged or chargeable for lying there. Those waters were public navigable waters; the bed of the stream had been dredged by the United States government; the town had no direct control of it; and the duty of the town either as wharfinger, or as equitable owner, did not extend to taking care of the bed of the stream, or to making it safe to the center, as a place for vessels to lie in. See *The Robin,* [1892,] Prob. 65. As wharfage was charged only for boats lying right along-side the dock, I doubt whether, in the case of so small a stream, any obligation rested upon the wharfinger as respects the bottom of the creek, beyond supplying a safe berth along-side the wharf where wharfage became chargeable. *The Calliope,* [1891,] App. Cas. 11; *The Moorcock,* 14 Prob. Div. 64. In the latter case the wharfinger was held liable because the vessel was in the berth directly along-side the jetty, which the wharfinger was held bound to make safe, because an essential part of the wharfage. This boat's position is wholly different. As I have said, it was not appurtenant to the wharfage, nor a part of it, but a place chosen by the boat, or her tug, to moor in, without inquiry of the defendants, or either of them, and without any directions from either.

Whether the bottom in mid-stream became uneven after the government dredging through the grounding and pressure of other boats in the mud, or from uneven deposits of silt, is not shown; nor is it material, as in neither case were the defendants bound to keep the bed even away from the docking berth. Vessels that chose to come in and lie outside, and near mid-stream, on the ground at low water, with or without knowledge of an uneven bottom that arose in the ordinary use of the creek, did so, I think, at their own risk. The case is quite different from that of slips of which the wharfinger has control, and where wharfage is chargeable, as in this city, though the vessel does not come alongside the wharf. Within a few minutes, moreover, after the boat took her position, the libelant's son learned the uneven nature of the bottom, its depth, and the holes about him; and he knew that the boat would ground at low water. No attempt was then made to remove her to any other place, nor was there any request for assistance to do so until after she had sprung a leak.

The captain testifies that had he known of the soundings and holes found by his son, he "would not have stayed a minute, but would have towed right away with the tug." He made no inquiries of Mr. Schmidt, the consignee, and did not direct his son to do so. In his hurry to return, he took the chances of mid-stream as a safe place to lie in, and as I cannot find that either of the defendants were under any duty to keep the bed of the middle of the stream level, the libel must be dismissed; but under the circumstances without costs.